# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **STEVEN R. DELK,** | ) | |
| Plaintiff, | ) | **Civil Action No. 7:16cv00554** |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **BRIAN MORAN,** *et al.*, | ) | **By: Norman K. Moon** |
| Defendants. | ) | **United States District Judge** |

Steven R. Delk, also known as Ja-Quitha "Earth" Camellia, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983 alleging various violations of his constitutional rights while housed at Red Onion State Prison ("ROSP").[1] (Dkt. 1). This memorandum opinion will address the motion for summary judgment filed by several defendants. (Dkt. 91). For the reasons that follow, I will deny the motion in part and grant the motion in part.

## I. Procedural History

The following defendants filed a motion for summary judgment together: Correctional Officer ("C/O") R. Adams, C/O L. Mullins, Lt. Fleming, C/O M. Mullins, Qualified Mental Health Professional ("QMHP") D. Trent, QMHP T. Huff, QMHP Fletcher, Dietician N. Gregg, and Food Service Supervisor Director P. Scarberry. Delk responded and this matter is ripe for disposition.

## II. Claims[2]

Delk's remaining claims are the following:

---

[1] I omit internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

[2] I have narrowed down Delk's numerous claims to those relevant to the motion for summary judgment currently before the court.

1. On March 27, 2015, QMHP Huff denied Delk mental health treatment or meaningful evaluation;

2. On November 12, 2015, Delk told QMHP Trent that he was a woman and that L. Mullins, M. Mullins, Adams, and several other officers were retaliating against him based on his grievances, race, and sexuality by verbally and physically sexually harassing him. He further asserts that his butt had been fondled and someone had touched his anus with a finger through his pants, and that his requests for treatment for dreams/nightmares, anxiety, depression, gender dysphoria, and other concerns, as well as mental health screening, diagnosis, evaluation, and treatment were ignored by QMHPs Trent, Huff, and Fletcher, and other staff;

3. QMHPs Trent, Huff, and Fletcher were aware of his serious mental health needs but intentionally failed to provide mental health screening, diagnosis, evaluation, and treatment while he deteriorated emotionally. They classified Delk as a MH-0 indicating that Delk did not require treatment or have mental health needs;

4. Adams began verbally and physically abusing Delk after discovering that Delk received a LGBTQ newsletter. On June 22, 2015, Adams made racially offensive remarks and threatened to starve Delk. After Delk reported the incident, Adams falsified records to indicate that Delk refused recreation and showers. Adams used repeated visual cavity and strip searches to humiliate Delk;

5. On July 12, 2015, Adams threatened to enter Delk's cell and beat him. Adams also threatened Delk at his cell, called him names, and unjustifiably OC sprayed Delk despite knowing Delk had asthma;

6. Adams wrote Delk two false disciplinary offense reports. L. Mullins and Fleming deprived Delk of due process during his disciplinary hearing because Delk was not allowed to cross examine a witness and the charge did not include a proper description of Delk's actions;

7. On May 16, 2016, Officer M. Mullins threatened to adulterate Delk's food because Delk snitched;

8. M. Mullins wrote a false disciplinary report to punish Delk for writing grievances. L. Mullins fabricated testimony, denied evidence at the hearing, and found Delk guilty;

9. L. Mullins and M. Mullins conspired to punish Delk and to deprive him of due process and an adequate remedy regarding the disciplinary charge written by M. Mullins.

10. Delk's Prison Rape Elimination Act ("PREA") grievances were not properly addressed at ROSP including his claim that he was sexually abused in the stairway fire escape. QMHP Huff did not help Delk;

11. Scarberry and Gregg failed to provide Delk with a suitable religious diet free of eggs, pork, and beans. Delk has lost weight as a result;

12. Adams, L. Mullins, and Fleming conspired to protect Adams' actions due to Delk's religion, sexual orientation, and race;

13. Trent, Huff, and Fletcher conspired to deprive Delk of his mental well-being;

14. M. Mullins and L. Mullins conspired to protect M. Mullins' actions against Delk due to his race, sexuality, and religion;

15. Adams and M. Mullins conspired to cover up their sexual abuse of Delk; and

16. Gregg and Scarberry conspired to starve or "deprogram" Delk because of his religious beliefs.

### III.     Legal Standards

### A. Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The dispute over a material fact must be genuine, "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). As such, the moving party is entitled to summary judgment if the evidence supporting a genuine issue of material fact "is merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 250.

The moving party bears the burden of proving that judgment on the pleadings is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the moving party meets this burden, then the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In considering a motion for summary judgment, the court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 322-324; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, the nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence set forth must meet the "substantive evidentiary standard of proof that

would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993).[3]

## B. Section 1983

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Notably, a plaintiff must sufficiently allege a defendant's personal act or omission leading to a deprivation of a federal right. *See Fisher v. Wash. Metro. Area Transit Author.*, 690 F.2d 1133, 1142-43 (4th Cir. 1982), *abrogated on other grounds by Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991). Negligent deprivations are not actionable under § 1983. *See, e.g.*, *Daniels v. Williams*, 474 U.S. 327, 330 (1986); *Pink v. Lester*, 52 F.3d 73, 77 (4th Cir. 1995).

## IV. Exhaustion

As a preliminary matter, Defendants argue that a majority of Delk's claims are not properly exhausted pursuant to the Prison Litigation Reform Act ("PLRA").

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42

---

[3] Delk is proceeding *pro se* and, thus, entitled to a liberal construction of the pleading. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 90-95 (2007). However, "principles requiring generous construction of *pro se* complaints are not . . . without limits." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). The Fourth Circuit has explained that "though *pro se* litigants cannot, of course, be expected to frame legal issues with the clarity and precision ideally evident in the work of those trained in law, neither can district courts be required to conjure up and decide issues never fairly presented to them." *Id.* at 1276. "A court considering a motion [for summary judgment] can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). "'[T]he language of section 1997e(a) clearly contemplates exhaustion *prior* to the commencement of the action as an indispensible requirement, thus requiring an outright dismissal [of unexhausted claims] rather than issuing continuances so that exhaustion may occur.'" *Carpenter v. Hercules*, No. 3:10cv241, 2012 WL 1895996, at *4 (E.D. Va. May 23, 2012) (quoting *Johnson v. Jones*, 340 F.3d 624, 628 (8th Cir. 2003)). The exhaustion requirement "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reduc[es] litigation to the extent complaints are satisfactorily resolved, and improve[es] litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219. Failure to exhaust all levels of administrative review is not proper exhaustion and will bar an inmate's § 1983 action. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

Ordinarily, PLRA exhaustion is mandatory. *See Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999). Nonetheless, courts are "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aguilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

VDOC Operating Procedure ("OP") § 866.1, Offender Grievance Procedure, is the mechanism used to resolve inmate complaints and requires that, before submitting a formal grievance, the inmate must demonstrate that he has made a good faith effort to resolve the

grievance informally through the procedures available at the institution to secure institutional services or resolve complaints. If the informal resolution effort fails, the inmate must initiate a regular grievance by filling out the appropriate form. Prior to reviewing the substantive claims of the grievance, prison officials conduct an "intake" review of the grievance to ensure that it meets the published criteria for acceptance. If the grievance does not meet the criteria for acceptance, prison officials complete the "intake" section of the grievance and return it to the inmate. The inmate may seek review of the intake decision by sending the grievance form to the Regional Ombudsman. On the other hand, if the grievance meets the criteria for acceptance, it is logged on the day it is received.

There are three levels of review for an accepted regular grievance. The Facility Unit Head of the facility in which the inmate is confined is responsible for Level I review. A dissatisfied inmate may appeal to Level II, which is conducted by the Regional Administrator, the Health Services Director, or the Chief of Operations for Offender Management Services. The Level II response informs the offender whether he may pursue an appeal to Level III, which is the final level of review.

Defendants argue that several claims were not properly exhausted. I agree that Delk failed to exhaust Claims 5, 7, 9, 10, 12, 13, 14, and 15 as identified above. For these claims, Delk did not follow proper exhaustion procedure, and, considering how many grievances and appeals he pursued, it is clear that the procedure was readily available to him. *See, e.g.*, *Woodford*, 548 U.S. at 81. Therefore, I will grant summary judgment as to these claims for failure to exhaust under the PLRA.

However, I disagree with Defendants as to Claim 1. Delk filed a regular grievance on the issue but it was rejected as a request for services. (Encl. B, dkt. 92-1). He later appealed that to

the Regional Ombudsman, who upheld the initial ruling. (*Id.*) That appeal, despite Delk's failure to correctly follow grievance procedure, demonstrates that, as to that particular claim, exhaustion was unavailable.

Therefore, only the following remain: (1) QMHPs Trent, Huff, and Fletcher failed to take appropriate action in the screening and diagnosis of Delk's mental illness; (2) Adams violated Delk's constitutional rights; (3) Fleming and L. Mullins failed to provide proper process for Delk; (4) M. Mullins violated Delk's rights by filing a false disciplinary charge; and (5) Scarberry and Gregg violated Delk's rights under the Free Exercise Clause and the Religious Land Use for Institutionalized Persons Act ("RLUIPA").

## V.     Matters of State Law and the PREA

### A. Constitution of Virginia

At the threshold, Delk's allegations pursuant to Va. Const. Art. I, §§ 9, 11, and 16 fail to state a claim on which relief may be granted. For a constitutional provision to be "operative," it must be self-executing or have associated legislation that allows for a cause of action. *Robb v. Shockoe Slip Found.*, 324 S.E.2d 674, 681-82 (Va. 1985); *Gray v. Va. Sec'y of Transp.*, 662 S.E.2d 66, 103 (Va. 2008). A provision is generally not self-executing if "it merely indicates principles, without laying down rules by means of which those principles may be given force of law." *Robb*, 324 S.E.2d at 681-82. First, Va. Const. Art. I § 9[4] "states only the principle that cruel and unusual punishment ought not to be inflicted, without any attendant rules"; therefore,

---

[4] Article I, § 9 asserts:
That excessive bail ought not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted; that the privilege of the writ of habeas corpus shall not be suspended unless when, in cases of invasion or rebellion, the public safety may require; and that the General Assembly shall not pass any bill of attainder, or any ex post facto law.

"§ 9 is not self-executing." *Quigley v. McCabe*, No. 2:17cv70, 2017 WL 3821806, at *5 (E.D. Va. Aug. 30, 2017).

Second, § 11[5] is Virginia's Due Process Clause and is self-executing "only in the context of claims of damages to or takings of property." *Quigley*, 2017 WL 3821806, at *6; s*ee also Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 728 (E.D. Va. 2015) ("Although the due process provision of the Virginia Constitution is self-executing, this has only been held to be true with regard to *property* deprivation."). Delk's claims do not implicate damages to or takings of property. Third, Delk fails to establish that Va. Const. Art. I, § 16 is self-executing. *See Bayadi v. Clarke*, No. 7:16cv00003, 2017 WL 1091946, at *6 (W.D. Va. Mar. 22, 2017) (dismissing plaintiff's Va. Const. Art. I, § 16 claim for failing to establish that § 16 was self-executing under similar circumstances). Therefore, Delk fails to state a cognizable claim based on Va. Const. Art I, §§ 9, 11, or 16.

Lastly, Delk asserts several claims under Va. Const. Art. I, § 12, Virginia's self-executing analogue to the First Amendment. *See McCaffrey v. Chapman*, No. 1:17cv937, 2017 WL 4553533, at *5 (E.D. Va. Oct. 12, 2017). Although the Supreme Court of Virginia has never clearly established the scope of relief of self-executing provisions of the Virginia Constitution, "the freedom of speech guaranteed by Article I, § 12 of the Constitution of Virginia is co-extensive with the protections guaranteed by the First Amendment of the Constitution of the United States." *Black v. Commonwealth*, 553 S.E.2d 738, 751 (Va. 2001) *vacated in part on other grounds*, 538 U.S. 343 (2003). "Therefore, Plaintiff's [Virginia] and federal constitutional free speech claims rise and fall together." *McCaffrey*, 2017 WL 4553533, at *5. As such, I will

---

[5] Va. Const. Art. I, § 11 states in relevant part: "That no person shall be deprived of his life, liberty, or property without due process of law."

analyze Delk's Va. Const. Art. I, § 12 claims under the framework of the First Amendment of the United States Constitution.

## B. State Law

Delk repeatedly asserts that Defendants violated Va. Code §§ 53.1, 54.1. However, Va. Code §§ 53.1, 54.1 are not statutes; they are Titles that contain multiple chapters and many statutes. The court is not required to dig through pleadings and state law to manufacture claims for a litigant, even if he is proceeding *pro se*. *See Beaudett*, 775 F.2d at 1278. Therefore, I will grant the motion for summary judgment as to claims purportedly based on Va. Code §§ 53.1, 54.1.

Next, Delk asserts claims under Va. Code § 8.01-42.1, which provides a right of action for victims of intimidation, harassment, violence, or vandalism, when such acts are motivated by racial, religious, or ethnic animosity. However, as discussed below in Part X, I will grant the motion for summary judgment as to the related First Amendment and RLUIPA federal claims and I will decline to exercise supplemental jurisdiction over the associated state law claims. *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."). Delk is free to file the dismissed Va. Code § 8.01-42.1 claims in state court.

## C. Prison Rape Elimination Act ("PREA")

Delk also asserts claims under the PREA and the VDOC's Operating Procedures related to the PREA. However, many courts have found that the PREA does not establish a private cause of action for allegations of prison rape. *See Krieg v. Steele*, 559 F. App'x 231, 232-33 (5th

Cir. 2015); *Chao v. Ballista*, 772 F. Supp. 2d 337, 342 n.2 (D. Mass. 2011). Furthermore, to any

extent Delk attempts to assert a PREA claim under Virginia law or the VDOC's Operating

Procedure, such a claim is not cognizable under § 1983.[6] Therefore, I will grant the motion for

summary judgment as to the PREA claims.

## VI.    Eighth Amendment  Medical Claims

Delk asserts several Eighth Amendment denial of medical care claims.  He claims that he

"has always identified as woman/male and was diagnosed with gender dysphoria[7] in 1987," and

he previously took testosterone blockers, estrogen enhancers, and other self-prescribed hormone

medication.   (Compl. ¶ 54).   He specifically alleges that QMHPs Trent, Huff, and Fletcher

denied him adequate mental health screening and treatment since 2013 for his gender dysphoria

and issues that resulted from correctional officers' sexual, physical, and verbal abuse.

### A.  Background

Delk claims that Defendants have continuously denied him mental health treatment since

2013.  Delk vaguely alleges issues prior to 2015, but he does not present any supporting facts for

---

[6] First, the PREA is a federal statute, not a Virginia law.  Second, Delk cannot state a § 1983 claim that any of the defendants failed to provide him the procedural protections provided under VDOC procedures.  A state official's failure to abide by state procedural regulations is not a federal due process issue, and is, therefore, not actionable under § 1983. *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

[7] Gender identity dysphoria ("GID") "refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender."  Am. Psychiatric Ass'n, *DSM-5*, 5th Ed. 451 (2013).  DSM-5, or the Diagnostic and Statistical Manual of Mental Disorders, is the taxonomic and diagnostic tool published by the American Psychiatric Association as the principal authority for psychiatric diagnoses and treatment recommendations. *See United States v. Townsend*, 886 F.3d 441, 444 (4th Cir. 2018) ("We may take judicial notice of facts outside the record where the fact may not be reasonable disputed and is relevant to the matter [disputed].").

that period. Instead, his allegations begin with an incident on March 21, 2015, when Delk submitted an informal complaint seeking mental health treatment, but QMHP Huff denied his request. At that time, Delk did not assert that he had GID or any other mental health disorder; instead, he complained about conditions in the prison, segregation, and the "psychiatric consequences" of his long prison sentence. (Encl. B, dkt. 92-1). Delk asserts that Huff's denial was a "personal decision" and not for any medical reason. On April 6, 2015, Delk submitted a grievance challenging Huff's decision and again sought mental health treatment.[8]

Following the July 12 incident, Delk continued to seek mental health treatment from his assigned provider, QMHP Trent. On July 14, Delk alleges that he "begged [QMHP Trent] for treatment to battle the emotional and physical strain of the day to day harassment [and] ridicule[]" for being an African-American woman and practicing paganism and voodoo. (Compl. ¶ 35). Some time later, Delk submitted another grievance and was granted a private session with QMHP Trent. Delk expressed he was losing his self-worth "because of the continuous verbal sexual harassment and fondling and physical assault and threats" by the Correctional Officers "because" of his sexuality, race, religion, and submitting grievances on their conduct. (*Id.* at ¶¶ 35-36).

On August 9, 2015, Delk submitted another informal complaint seeking mental health treatment to cope with the negative effects of the sexual assaults and harassment. He made no mention of GID. This prompted a series of requests for psychiatric treatment, which Delk alleges QMHP Trent refused "every time." (*Id.* at ¶ 39). On August 13, 2015, QMHP Trent informed Delk that prison psychiatrist Dr. McDuffie determined Delk did not need psychiatric

---

[8] Grievance Coordinator Messer denied the grievance as a request for services because such a request was not grievable. Delk appealed the intake decision, but the Regional Ombudsman upheld the intake rejection.

treatment despite Delk having "never spoken or interacted with Dr. McDuff[ie] since being at [Red Onion.]" (*Id.* at ¶ 40). QMHP Trent told Delk that he did not see a problem because Delk was "very articulate" and was "not displaying the signs associated with mental illness." (*Id.* at ¶ 41). Delk alleges that QMHP Trent told as much to Dr. McDuffie, and that Dr. McDuffie's determination that Delk did not need psychiatric treatment was not based upon any personal diagnosis or evaluation of Delk.[9] (*Id.* at ¶¶ 38-43, 146-150).

Delk further contends that, by November 12, 2015, he had described to QMHP Trent that he was a woman and that correctional officers had escalated their sexual harassment. (*Id.* at ¶ 44-46). Delk states that he sought treatment for his self-diagnosed gender dysphoria, nightmares, night sweats, anxiety attacks, physical tremors, sleep deprivation, fits of crying, depression, and "mental sexual roller coaster." (*Id.* at ¶ 45). Delk also broadly alleges that QMHP Trent, Huff, Fletcher, and Dr. McDuffie were aware of Delk's sexual identity gender disorder, sexual harassment, sexual assaults, and long-term placement in segregation housing, yet repeatedly classified him as "no treatment no mental health needs" ("MH-0"). (*Id.* at ¶¶ 44-47).

QMHP Huff, who is the QMHP supervisor, asserts that he had no knowledge of Delk's GID until mid- November 2016 when he was made aware of a letter Delk wrote in November 2016 to the VDOC Mental Health Director stating, "I'm a woman in a man's body." (Huff Aff. ¶ 4, dkt. 92-5). Huff admits he knew Delk was gay but denies that Delk ever told him about GID. When reviewing Delk's records in late 2016, Huff found no evidence that Delk was ever diagnosed with GID. (*Id.*). Huff states that, during Delk's initial screening, Delk stated that he was diagnosed with GID by a doctor whose name he could not remember and that he had acted as a woman in the past.

---

[9] Dr. McDuffie filed a separate motion for summary judgment, which I granted. He is no longer a party to this action. *See* Order, dkt. 168.

Huff then spoke with Dr. Lee, the Western Regional Mental Health Clinical Supervisor, and a psychological evaluation was conducted on Delk in December 2016. The evaluation determined that Delk met the criteria for gender dysphoria, and Delk was referred to the consulting psychiatrist at ROSP, Dr. McDuffie. After further evaluation in mid-March 2017, medical staff concluded that Delk met the criteria for gender dysphoria and he was provided the level of services and treatment available at ROSP. (*Id.* at ¶¶ 4-6).

QMHP Trent, who was assigned to Delk, was required to see Delk at least quarterly. (Trent Aff. ¶ 4, dkt. 92-6). However, Trent saw Delk more frequently because Delk would request to speak with Trent. (*Id.*). Trent states that Delk usually complained of headaches or sleep problems. (*Id.*). Trent asserts that security never interfered with his treatment of Delk, he had met Delk in a private setting several times, and he was unaware of any physical assault or touching by security staff because Delk never mentioned it. (*Id.* at ¶ 5). Trent alleges that Delk first told him, "he felt like he was a woman in a man's body," in November 2016. (*Id.* at ¶ 6). Trent reported the statement to his supervisor, QMHP Huff, and Delk received further treatment a short time later. (*Id.*).

## B. Standard

Under the Eighth Amendment, prisoners have the right to receive adequate medical care while incarcerated. *See Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016). In order to state a claim for denial of medical care, a plaintiff must allege facts sufficient to demonstrate that jail officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Staples v. Va. Dep't of Corr.*, 904 F. Supp. 487, 492 (E.D. Va. 1995). A prison official is "deliberately indifferent" only if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S at 837. "[A]n inadvertent failure to provide adequate

medical care" does not satisfy the standard; thus, mere negligence in diagnosis or treatment is insufficient to state a constitutional claim. *Estelle*, 429 U.S. at 105-06; *see Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard – a showing of mere negligence will not meet it."). Additionally, a lapse in professional judgment or mere disagreement with medical personnel with respect to a course of treatment does not necessarily amount to deliberate indifference. *Farmer*, 511 U.S. at 844; *see Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Courts treat an inmate's mental health claims as seriously as any physical health claims. *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977). To establish a claim for denial of medical care against non-medical personnel, an inmate must show that the non-medical personnel failed to promptly provide needed medical treatment, deliberately interfered with prison doctors' treatment, or tacitly authorized or were indifferent to the prison physicians' misconduct. *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990). Non-medical prison officials are entitled to rely on the opinions, judgment, and expertise of medical personnel concerning the inmate's diagnosis and course of treatment. *Id*.

### C. Analysis

At the threshold, Delk fails to state a claim against QMHPs Fletcher and Huff. The record shows that QMHP Huff personally denied a request for mental health treatment from Delk one time, in March 2015. Besides that single interaction, Delk only asserts conclusory allegations against Huff, and does not assert any personal involvement on behalf of Fletcher. (*See* Compl. ¶ 32 (denial of treatment by Huff in March 2015); *id.* at ¶ 47 (bald assertion that all

the QMHPs, including Huff and Fletcher, were aware of Delk's serious mental health needs and were watching him deteriorate); *id.* at ¶ 48 (naked allegation that all QMHPs, including Huff and Fletcher, ignored Delk's serious issues and continued to classify him as requiring no treatment); *id.* at ¶ 50 (unsupported statement that all the QMHPs, including Huff and Fletcher, relied on VDOC policy to justify their decision to deny Delk treatment despite his symptoms); *id.* at ¶ 51 (all the QMHPs, including Huff and Fletcher, allegedly told Delk that he is not a priority as "no treatment no mental health needs" ("MH-0")); *id.* at ¶ 53 (all the QMHPs, including Huff and Fletcher, followed unconstitutional policy)). Delk's allegations, entirely unsupported by facts, are not entitled to be taken as true. *Iqbal*, 556 U.S. at 679.

The evidence also establishes that, as of March 2015, Delk had not yet informed ROSP staff of his GID or displayed any other symptoms requiring a psychiatric consultation. Furthermore, after March 2015, QMHP Trent appears to have exclusively treated Delk, and Trent repeatedly reported that Delk did not require treatment. Even if QMHPs Fletcher and Huff had closely reviewed Delk's medical file, they would have only seen Trent's reports of "no treatment required" and Dr. McDuffie's determination, based on Trent's reports, that psychiatric treatment was unnecessary. Accordingly, Fletcher and Huff would have had no reason to believe that Delk had a serious mental health issue, and they were entitled to rely on the physician's opinion. *See Farmer*, 511 U.S. at 844 (requiring awareness of serious medical need); *Miltier*, 896 F.2d at 854 (prison staff generally entitled to rely on physician's opinion); *Lowery v. Bennett*, 492 F. App'x 405, 411 (4th Cir. 2012) (holding that a plaintiff "must show that the medical need was serious *when he was examined* by the defendant, not that they were serious later").

Regardless, Delk has not specifically alleged that substantial harm resulted from Fletcher's actions or from Huff's March 2015 denial of mental health services. *See Stokes v. Hurdle*, 393 F. Supp. 757, 761 (D. Md. 1975) ("A single, isolated denial of medical treatment would likely only amount to mere negligence, which is not sufficient to show a violation of the Eighth Amendment, at least where no substantial harm resulted from the failure to provide care."). Therefore, Delk fails to demonstrate a genuine dispute of material fact as to his Eighth Amendment claims against QMHPs Fletcher and Huff. They are entitled to qualified immunity as to damages and summary judgment as to the deliberate indifference claims.

As for QMHP Trent, the objective factor is satisfied because GID is a serious medical condition. Second, Delk establishes a genuine dispute regarding the subjective factor. Delk asserts that he informed QMHP Trent of his mental health issues, including GID, long before Trent notified Huff and Dr. McDuffie in November 2016. Instead, Delk alleges he told Trent about his GID in November 2015, but that Trent denied him mental health services for a year. Trent rejects Delk's allegations but admits that he was Delk's assigned QMHP and he personally saw Delk frequently. Therefore, taking Delk's allegations as true, a genuine dispute remains as to whether Trent knew that Delk suffered a serious mental health condition but refused to provide treatment and/or interfered with treatment by falsely reporting that Delk did not have GID.

Further, Trent is not entitled to rely on Dr. McDuffie's opinion as a physician because Dr. McDuffie's determination was entirely based on Trent's allegedly defective reports—Delk asserts that Trent was aware of Delk's sexual identity gender disorder, sexual harassment, sexual assaults, and long-term placement in segregation housing, yet still classified Delk as MH-0, "no treatment no mental health needs." Accordingly, I conclude that Delk established a genuine

dispute of material fact, Trent is not entitled to qualified immunity for damages, and I will deny the motion for summary judgment as to the deliberate indifference claim against Trent.[10]  *See Vathekan v. Prince George's Cty.*, 154 F.3d 173, 180 (4th Cir. 1998) ("Summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendant.").[11]

## VII.    Eighth Amendment Claims Against C/O Adams

Delk asserts a multitude of claims against C/O Adams, including that Adams: (1) sexually, physically, and verbally abused  Delk in violation of the Eighth and Fourteenth Amendments; and (2) used chemical spray on Delk's mouth and face in violation of the Eighth and Fourteenth Amendments.  First, to the extent that Delk makes any claim of bodily integrity, the Eighth Amendment, rather than the Fourteenth Amendment, controls.  *See, e.g.*, *Hudson v. Palmer*, 468 U.S. 517, 527-28 (1984).  Therefore, I will limit my analysis of Delk's claims against Adams to the Eighth Amendment.

### A.  Delk's Allegations

---

[10] "[Q]ualified immunity operates to protect law enforcement and other government officials from civil damages liability for alleged constitutional violations stemming from their discretionary functions." *Raub v. Campbell*, 785 F.3d 876, 880-81 (4th Cir. 2015).  In deciding whether defendant is entitled to qualified immunity, the court must determine "(1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Id.* at 881.  A "court 'may address these two questions in the order . . . that will best facilitate the fair and efficient disposition of each case.'" *Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 8  92, 898 (4th Cir. 2016) (quoting *Raub*, 785 F.3d at 881).  A plaintiff's claim "survives summary judgment, however, only if [the court] answer[s] both questions in the affirmative." *Id.*

[11] To any extent Delk attempts to raise continuing violation claims and/or claims based on events after November 2016, the record establishes that the QMHPs quickly referred Delk to a psychiatrist and Delk has since been evaluated and treated by a team of medical professionals. Thus, they were entitled to rely on the physicians' orders after November 2016. *See Miltier*, 896 F.2d at 854.

Delk asserts that he was subjected to ongoing sexual abuse by correctional officers because of his GID. Specifically, when he was housed in C-Building, Adams noticed that Delk received a LGBTQ newsletter and verbally and physically assaulted Delk, including fondling him and offering "quid pro quo sexual propositions" on a regular basis. (Compl. at ¶ 57). Delk consistently refused Adams' advances and Adams responded to the rejection with violent threats. (*Id.* at ¶¶ 56-57).

On June 22, 2015, When referring to Delk, Adams used racial slurs and sexually degrading language and threatened to starve Delk after Ramadan was over. (*Id.* at ¶ 58). Delk alleges that Adams' anger that day stemmed from Delk's "refusal to put on a visual show for [Adams] during the visual cavity search [Delk] is subjected to every time he wishes to leave his cell." (*Id.* at ¶ 60). Following Adams' threats, Delk reported Adams to the Unit Manager and explained the incident in detail. (*Id.* at ¶ 61).

After the June incident, Adams' threats and sexual assaults against Delk escalated. Adams used repeated visual cavity strip searches "as an opportunity to humiliate [Delk] and to satisfy [Adams'] own sexual desire to have sex with [Delk.]" (*Id.* at ¶ 62). On several occasions, Adams told Delk he would have sex with Delk "whether [Delk] allowed it or not [and] that he perferred [sic] the act of slamming [Delk's] face into the wall and taking his black ass." (*Id.*). Delk begged Adams to stop and leave him alone, apologized to Adams for making him angry, and told Adams he would report him if the behavior did not stop. (*Id.* at ¶ 63). However, Delk's actions "only seem[ed] to enflame [Adams] more sexually and with anger." (*Id.*). Fearing that Adams was a "real rapist," Delk wrote grievances, informal complaints, and letters, and verbally reported Adams' behavior. (*Id.* at ¶¶ 64-65). In response to his reporting of Adams' behavior, Delk alleges that Adams threatened to rape him, wrote him false disciplinary

offenses, refused Delk recreation time and showers, and falsified the segregation unit chart to state that Delk refused activities. (*Id.* at ¶¶ 61-65). Subsequently, Delk alleges that Adams "viciously raped" him, forced him "to perform fellatio on him and engag[e] in anal intercourse," and caused "tearing" to his rectum. (Pl.'s Reply Br. ¶¶ 4-6, dkt. 110).[12]

On July 12, 2015,[13] Delk asserts that Adams threatened to enter his cell and, using racially and sexually charged language, threatened to physically assault him. (Compl. at ¶ 66). Taking the threat seriously, Delk wrote an affidavit on the same day, stating that he "feared for his safety" and detailing Adams' comments. (*Id.* at ¶ 67). Later that day, Adams entered Delk's cell and stated, "Bitch do you want to wash your nasty black ass." (*Id.* at ¶ 68). When Delk ignored him, Adams stated, "I thought not you fucking coward. But you are coming out of that cell . . . I promise you that dick sucker." (*Id.*). Delk immediately reported the incident to the sergeant on duty, and the sergeant notified Adams. Shortly after he reported Adams, Adams returned to Delk's cell, slammed open the security box on the cell door, and called Delk a "black ass snitch." (*Id.* at ¶ 70). When Delk told Adams to leave him alone, Adams closed the security box and called Delk a "dick sucking snitch." (*Id.* at ¶ 70). Delk went into a "mental meltdown of fear," but wrote affidavits[14] and told other correctional officers to stop Adams. (*Id.* at ¶ 71).

Hours later, Adams returned to Delk's cell and ordered: "Back up and be restrained[,] back up to the fucking door to be fucking handcuffed." (*Id.* at ¶ 72). As Adams relayed his orders, Delk noticed that other officers accompanied Adams, but no sergeant or lieutenant was present. Delk states that Adams was not using proper security protocol, which heightened his

---

[12] Delk also states that Adams used "racial intimidation tactic[s]," threats, harassment, and physical retaliation, including finger penetration of his anus. (*Id.* at ¶ 5(2)(B)).

[13] In Delk's complaint, Delk initially references the date of the incident as having occurred on July 11. However, the discussion of this incident in defendants' materials and in Delk's response identify the date in question to be July 12, and I will refer to it as such.

[14] Apparently, Delk did not submit these affidavits to anyone.

fear as he complied with the order. (*Id.* at ¶ 73). Delk asked for a sergeant or lieutenant to be present or "anyone to help [him]." (*Id.*). In response, Adams turned to the other officers and stated, "He said he ain't coming out there," then turned to Delk and stated, "I am the [Sergeant]." (*Id.* at ¶ 74). Delk responded that he was coming out of the cell and was stripping in accordance with policy. While laughing, Adams reached his arm into Delk's cell holding chemical spray.

Petrified, Delk urinated on himself and told Adams that he had asthma. (*Id.* at ¶ 77). As Delk was speaking, Adams sprayed Delk in the mouth and nose area with two long bursts of the chemical spray. (*Id.*). Adams stated, " I don't give a fuck what you got . . . Now back your black ass up to be cuffed." (*Id.* at ¶ 78). One of the other unnamed officers stated, "You know he has to get naked and put his clothes in the box first." (*Id.* at ¶ 79). Delk heard laughter, then Adams stated, "Now take your clothes off bitch." (*Id.* at ¶ 80). Delk immediately removed his clothes even though his eyes were running, his whole face was burning, and he was sweating, wheezing, coughing, and unable to breathe or swallow. (*Id.* at ¶¶ 80-81).

Delk stood naked during the search and recited his prayers despite his difficulty breathing. He feared that he would die or that Adams would further assault him. Delk perceived an imminent threat of having a major asthma attack, especially because of his history of being "hospitalized for months because of his allergies triggering anaphylaxis." (*Id.* at ¶ 83-84). Adams then conducted four visual cavity searches of Delk, forcing Delk to "bend over facing cheeks towards him." (*Id.* at ¶ 85). Delk cried and felt dehumanized and humiliated. (*Id.* at ¶ 85).

After Delk was allowed to exit his cell, a sergeant appeared. Delk asked why the officers had not documented the search with a camera and told the sergeant, "[Adams] sprayed me I have asthma you know this." (*Id.* at ¶ 86). The sergeant responded he obtained approval to spray

Delk from Nurse Yates.  (*Id.* at 87).  Delk stated, "This was a planned assault you let him assault me.  Where was the camera.  You got prior approval.  You had time to get a camera this was not an emergency."  (*Id.* at ¶ 88).  Adams was holding Delk as he continued to wheeze and stated, "I'll give you a camera bitch, shut the fuck up."  (*Id.* at ¶ 89).  The sergeant then stated he would go get a camera and "told [ ]Adams [to] write [Delk] some charges."  (*Id.* at ¶ 90).  A camera was not present until after Delk was returned to his cell.

Adams wrote two disciplinary offense reports on Delk based on the events of July 12.  Delk alleges the reports included false allegations "for the purpose of inflicting a punishment on [him.]"  (*Id.* at ¶ 93).  Delk was later found guilty of one charge (attempted damage of property), while the other (failure to follow direct command) was dismissed.  Delk alleges he suffered psychological trauma and stigmatization because of the false disciplinary charges and for filing grievances against Adams.  He alleges that the false charges and reoccurring sexual assaults and harassment by Adams were in retaliation for Delk rejecting Adams' advances and filing grievances against him.  (*Id.* at ¶¶ 94-96).  When Delk was returned to his cell he was still under the effects of pepper spray, and Adams told him that if he asked for a shower "he would burst [Delk's] head against the wall."  (*Id.* at ¶ 92).  Delk thus refused decontamination and continued to suffer from the spray.  (*Id.* at ¶ 92).  Delk asserts physical harm, emotional pain, distress, and the inability to sleep or eat normally.

## B.  Adams' Version of Events

Adams asserts that he never: handled Delk's mail, knew that Delk received an LGBTQ newsletter, harassed Delk, denied Delk showers, recreation, or decontamination, conversed with Delk concerning Delk's sexual orientation or religious preference, retaliated against Delk in any

way, or threatened to beat or starve Delk. He alleges that his interactions with Delk were professional and routine, and that another officer was always present.

Adams admits that he OC sprayed Delk once on July 12, 2015—however he claims that he used the spray because Delk became disruptive prior to a random cell inspection. Specifically, he ordered Delk to come to the door to be restrained; Delk refused and started cursing at Adams; and, when Adams repeated his order, Delk grabbed a cup and started to climb his sink to break the cell's sprinkler head. (Adams Aff. ¶¶ 4-6, 7, dkt. 92-4). Adams then used a half-to-one-second burst of spray through the tray slot at Delk's face. After spraying Delk, Delk was removed from his cell without further incident or use of force. After the nurse checked on Delk, Delk refused decontamination. (*Id.*; Encl. A, dkt. 92-4; Encl. B, dkt. 92-4). Adams wrote two disciplinary charges based on the incident, one for #201, disobeying a direct order, and another for #111/198b, attempting to commit/steal/intentionally destroy/alter/damage state property. (*Id.* at ¶ 9). The #201 charge was later dismissed. (Adams Aff. ¶¶ 4-6).

## C. Standard

In order to state an Eighth Amendment claim against a prison official, the plaintiff inmate must demonstrate that (1) the alleged conduct is "objectively, sufficiently serious"; and (2) that the prison official was "deliberately indifferent to the plaintiff's rights, health or safety," and had a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). It is well-settled that sexual abuse of an inmate by a prison official is cognizable as an Eighth Amendment claim. *See Farmer*, 511 U.S. at 834 ("Being violently assaulted in prison is simply

23

not part of the penalty that criminal offenders pay for their offenses against society."); *Boddie v. Schieder*, 105 F.3d 857, 861 (2d Cir. 1997) ("[B]ecause sexual abuse by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims.").

### D. Analysis

#### 1. Sexual and Physical Abuse

Adams states that he did not sexually, verbally, or physically abuse Delk. Instead, Adams attempts to characterize his treatment of Delk as, at the most, verbal harassment and idle threats that are not actionable. I disagree. Viewing the facts in the light most favorable to Delk, Adams' alleged repeated and unwanted sexual contact with Delk and the purposefully humiliating strip searches are "objectively, sufficiently serious" for purposes of the Eighth Amendment. *See, e.g.*, *Washington v. Hively*, 695 F.3d 641, 643 (7th Cir. 2012) ("An unwanted touching of a person's private parts, intended to humiliate the victim or gratify the assailant's sexual desires, can violate a prisoner's constitutional rights whether or not the force exerted by the assailant is significant."); *Bromell v. Idaho Dep't of Corr.*, No. 05-419, 2006 WL 3197157, at *4 (D. Idaho Oct. 31, 2006) ("[U]ninvited sexual contact that is done maliciously and sadistically to cause harm and that does not advance any legitimate security interest is the type of conduct that is 'inconsistent with contemporary standards of decency' and, therefore, violates the Eighth Amendment.").

As to the subjective component of Delk's claim, Delk has alleged sufficient facts on which a factfinder could determine that Adams acted with a "sufficiently culpable state of mind." *See id.* at 861 ("Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient

evidence of a culpable state of mind."); *Giron v. Corr. Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999) (for sexual abuse or rape, "the conduct itself constitutes sufficient evidence that force was used 'maliciously and sadistically for the very purpose of causing harm'") (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). Therefore, Delk alleges facts supporting deliberate indifference, the second element of the Eighth Amendment standard as to the sexual and physical abuse claim.[15]

## 2. OC Spray

Next, Delk alleges that Adams used pepper spray on him on July 12, 2015 for the sole purpose of humiliating and punishing him. Adams admits that he sprayed Delk, but he claims that it was necessary because Delk was standing on the sink in his cell, attempting to break the sprinkler. Delk claims that he was backed up to the bed in his cell and was not being disruptive. (*See* Pl.'s Reply Br. at 8). Delk also alleges that he refused post-spray decontamination only because Adams threatened that "he would burst [Delk's] head against the wall" if Delk asked for decontamination.

The Eighth Amendment's prohibition on cruel and unusual punishment forbids the malicious and sadistic infliction of pain on prisoners. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). To determine "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm," the Supreme Court has established the following factors: (1) the need for application of force, (2) the relationship between the need and the amount of force used, (3) the extent of any inflicted injury, (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the

---

[15] Although Delk's allegations regarding the sexual remarks are not independently actionable under the Eighth Amendment, they lend factual support to Delk's allegations regarding the subjective prong.

responsible officials on the basis of the facts known to them, and (5) any efforts made to temper the severity of a forceful response. *Id.* at 321.

Viewing the evidence in the light most favorable to Delk, all of the *Whitley* factors are in dispute. First, Delk asserts that there was no need for force; Adams states that force was necessary to prevent Delk's disruptive behavior. Second, Delk alleges that, since no force was necessary, the amount of force was excessive; Adams disagrees. Third, Delk asserts significant injuries that lasted longer than necessary because of Adams' behavior; Adams contends that Delk only suffered minor harm. Fourth, Delk states that he posed no threat; Adams alleges that Delk was a disruptive threat. Fifth, Delk claims that Adams made no effort to temper his use of force, and unnecessarily sprayed Delk twice; Adams states that he used minimal force and only sprayed Delk once.

Therefore, genuine disputes of material fact remain as to the Eighth Amendment claims against Adams. As such, Adams is not entitled to summary judgment or qualified immunity on the claims.

## VIII. Fourteenth Amendment Due Process Claims

Delk raises Fourteenth Amendment due process claims against Adams and M. Mullins based on false disciplinary charges and against Fleming and L. Mullins because of disciplinary hearings.

### A. Facts Related to Adams and M. Mullins

As discussed in Part VII, Delk alleges that Adams brought false disciplinary charges against him after the July 12, 2015 incident. Adams asserts that the two disciplinary charges were valid because Delk disobeyed a direct order and attempted to "commit/steal/intentionally

destroy/alter/damage state property." VDOC records reflect that the charge for disobeying a direct order was later dismissed. (Adams Aff. ¶ 9; Encl. C, dkt. 92-4).

As to M. Mullins, Delk contends that, on May 16, 2016, Officer M. Mullins threatened to adulterate Delk's food for snitching and writing grievances on other prison officials. M. Mullins told Delk, "[B]e careful what you put in your mouth bitch, I hope you can enjoy your meal I added a little something." (Compl. ¶ 107). Delk asserts that M. Mullins wrote a false disciplinary report to punish Delk for writing grievances, which "stigmatized" Delk as a rapist and accused Delk of masturbating on M. Mullins while stating, "I can't wait to shove this fat cock up your tight white ass." (*Id.* at ¶ 109). Delk asserts that M. Mullins' report of what happened is "ludicrous and disgusting" because it does not adhere to Delk's sexual orientation, and that M. Mullins was "satisfying his own sexual pleasure" by punishing and humiliating Delk. (*Id.* at ¶¶ 107-112). At Delk's disciplinary hearing, Delk alleges that M. Mullins fabricated testimony and denied evidence so that Delk would be found guilty. Although Delk was afforded a hearing for the disciplinary charges, he asserts he was denied proper due process because the evidence used against him was false.

In M. Mullins' version of events, Delk "hollered" at M. Mullins from his cell on May 8, 2016 as Mullins walked by the cell. M. Mullins went to the door of Delk's cell and observed Delk with his pants down masturbating in M. Mullins direction when Delk stated, "I can't wait to shove this fat cock up your tight white ass." (M. Mullins Aff. ¶ 4, dkt. 92-2). Based on this conduct, M. Mullins charged Delk with Disciplinary Offense #137A for lewd or obscene acts directed toward or in the presence of another. (*Id.*). Delk was served with a copy of M. Mullins' Disciplinary Offense Report on May 9, 2016, which advised Delk of his due process rights for his upcoming disciplinary hearing scheduled for May 16, 2016. (*Id.*; Encl. A, dkt. 92-2).

**B. Facts Related to Fleming and L. Mullins**

Delk contends that Lt. Fleming and L. Mullins deprived him of a hearing that complied with his procedural and substantive due process rights because he was: not notified of the details of the reporting officers' testimony, prevented from cross-examining a witness, and denied the opportunity to present rebuttal or witness evidence when the correctional officers changed the description of the offense at the hearing. Delk also alleges that L. Mullins denied him exculpatory rapid eye camera footage, access to witnesses, and the opportunity to present rebuttal evidence. (Compl. at ¶ 113).

**C. Standard**

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

As a convicted prisoner, Delk does not have an inherent constitutionally protected liberty interest in avoiding penalties for prison disciplinary infractions. *Wolff v. McDonnell*, 418 U.S. 539, 556-7 (1974). A state-created liberty interest may exist, however, if Delk (1) points to "a basis for an interest or expectation in state regulations" in avoiding a particular penalty, *Prieto*, 780 F.3d at 250, and (2) shows that the penalty "impose[d] atypical and significant hardship . . . in relation to the ordinary incidents of prison life" or will "inevitably affect the duration" of his

confinement, *Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995). Only if Delk makes these showings does the Due Process Clause require a particular measure of protection. *Id*.

As for disciplinary proceedings, "advance written notice of the claimed violation and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary actions taken" may satisfy due process. *Wolff*, 418 U.S. at 556, 566. An inmate charged with a violation must be given (1) advance written notice of the charges at least 24 hours before the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) a written statement by the factfinders as to the evidence relied on for their decision, and the reasons for the prison committee's action. *Id.* at 564-66.

### D. Analysis

To the extent Delk attempts to raise Fourteenth Amendment claims against Adams and M. Mullins based on false disciplinary charges, "the mere filing of [a false] charge itself" does not constitute a cognizable claim under § 1983 if the inmate "was granted a hearing, and had the opportunity to rebut the unfounded or false charges." *Freeman v. Rideout*, 808 F.2d 949, 952-53 (2d Cir. 1986). Here, Delk does not challenge the procedures related to the Adams charge and Adams had no control over the associated disciplinary hearing. As to the false disciplinary charge claim against M. Mullins, Delk does not dispute that he received advance written notice of the charge.[16] The record also establishes that he was given the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence, and the factfinders provided him a written statement as to the evidence and reasoning relied on for the decision. (*See* Encls. B, C,

---

[16] Delk was served with a copy of M. Mullins' Disciplinary Offense Report on May 9, 2016, which advised Delk of his due process rights for his upcoming disciplinary hearing scheduled for May 16, 2016. (M. Mullins Aff. ¶ 4; Encl. A, dkt. 92-2).

dkt. 92-3).[17]  Therefore, I will grant the motion for summary judgment as to the false disciplinary charges against Adams and M. Mullins.

Lastly, Delk alleges Fleming and L. Mullins violated Delk's due process rights in the disciplinary hearings by denying him exculpatory rapid eye camera footage, access to witnesses, and the opportunity to present rebuttal evidence.   While inmates retain certain procedural protections at disciplinary proceedings, "prison officials must have the necessary discretion . . . to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Wolff*, 418 U.S. at 556.  The Fourteenth Amendment due process clause does not require prison officials to state on the record their reasons for denying an inmate's request to confront a particular witness "so long as the reasons are logically related to preventing undue hazards to 'institutional safety or correctional goals[.]'"  *Ponte v. Real*, 471 U.S. 491, 496 (1985).  The operation of a prison is an "extraordinarily difficult undertaking," and therefore, prison administrators should be free to exercise their discretion "without being subject to unduly crippling constitutional impediments." *Wolff*, 418 U.S. at 566-67.

On judicial review of the decision of a prison administrator, the reviewing court must balance the concern to safeguard the rights of individual inmates with the legitimate needs and goals of the penal institution. *See Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445 (1985);  *Ponte*, 471 U.S. at 494.  The extent to which prisoners may confront and cross-examine witnesses should be left to the sound discretion of prison officials and administrators. *Baxter v. Palmigiano*, 425 U.S. 308, 321-22 (1976).

---

[17] Delk also has no federal claim that any of the defendants failed to provide him the procedural protections provided under VDOC procedures.  *See Riccio v. Cty. of Fairfax*, 907 F.2d at 1469.

As the prison administrator who decided the guilty outcome of Delk's challenged disciplinary hearing, L. Mullins used his discretion to deny Delk's procedural and evidentiary requests. L. Mullins avers that Delk submitted three witness request forms, requesting Brian Moran, the Virginia Secretary of Public Safety, Warden Barksdale, and Investigator Murphy to each testify about rapid eye video footage of the incident with M. Mullins. (*See* L. Mullins Aff. ¶ 7, dkt. 92-3). L. Mullins submits that Delk's requested witness statements were not obtained because their testimony was not relevant to the offense—the footage was inconclusive, and that Delk did not submit a request for documentary evidence of the rapid eye video footage itself. (*Id.*).

Giving deference to L. Mullins and Fleming's decision as the prison administrators over Delk's challenged disciplinary hearings, and finding that the relevant law does not require the identification reasons for denying requests to confront certain witnesses, I conclude that Delk cannot show he was deprived of any of the limited procedural protections to which he would have been entitled if he had a protected liberty interest. Accordingly, Delk fails to establish a genuine dispute of material fact as to his Fourteenth Amendment against L. Mullins or Fleming, and they are entitled to qualified immunity for damages and summary judgment.[18]

---

[18] As for Fleming, Delk's allegations also fail to state a claim on which relief may be granted. Allegations against Fleming are brief and directly associated with L. Mullins. (*See* Compl. ¶ 97 ("D.J. Fleming and L. Mullins deprived plaintiff of a hearing that complied with the due process clause or the state liberty interest. Plaintiff was not given even the minimum requir[e]ments procedurally or substant[ive]ly."); *id.* at ¶ 99 (D.J. Fleming and L. Mullins['] refusal to allow plaintiff to cross examine a witness by allowing the use of a person as a witness that was not listed as a witness deprived plaintiff of due process."); *id.* at 17, 18 (inclusion of Fleming in a list of federal and state law claims); Pl.'s Reply Br. at ¶ 49 ("Defendant D.J. Fleming has fail[ed] to respond in any way putting forth no defense to plaintiff['s] complaint [and] conceding to all her allegation[s] specific to him.)). Delk's assertions are conclusory, entirely unspecific, and do not demonstrate Fleming's personal involvement as required by § 1983. Therefore, he fails to state a claim on which relief may be granted. *See Iqbal*, 566 U.S. at 679; 28 U.S.C. § 1915(e)(2)(B)(ii).

### IX. Retaliation Claims Against Adams and M. Mullins

Delk also raises claims against C/Os Adams and M. Mullins, alleging retaliation in violation of his First Amendment rights.  First, Delk alleges Adams retaliated against Delk for rejecting Adams' sexual advances and filing grievances against him.  Specifically, Delk states that Adams retaliated by writing false disciplinary charges and repeatedly sexually abusing Delk to punish him.  Second, Delk alleges that M. Mullins wrote false disciplinary charges "to force [Delk] to stop engaging in [Delk's] letter writing and grievance writing" against M. Mullins and other correctional officers.  (Pl.'s Reply Br. at 14).  Delk further alleges that, on May 16, 2016, M. Mullins threatened to adulterate Delk's food for snitching and writing grievances, telling Delk, "be careful what you put in your mouth bitch, I hope you can enjoy your meal I added a little something."  (Compl. ¶ 107).  As a result of Adams and M. Mullins conduct, Delk argues he suffered psychological trauma and stigmatization.

It is well-settled that prison officials cannot retaliate against inmates for exercising a constitutional right.  *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001).  To state a claim for First Amendment retaliation under Section 1983, a plaintiff must allege that (1) the conduct was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal relationship between the protected conduct and the retaliatory action.  *Raub,* 785 F.3d at 885; *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

First, Delk sufficiently pleads he engaged in protected First Amendment activity.  Inmates have a constitutional right "to petition the Government for a redress of grievances."  *Kirby v. City of Elizabeth City*, 388 F.3d 440, 448 (4th Cir. 2004) (internal quotations omitted).  This includes the right to be free from retaliation for filing grievances.  *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 546-7 (4th Cir. 2017).  Accordingly, Delk's filing of grievances, and his

right to be free from retaliation for seeking redress of those grievances, are protected First Amendment activities.

Second, Delk adequately pleads that Adams and M. Mullins took adverse action against him by writing false disciplinary charges. The relevant inquiry is whether incurring false disciplinary charges and their associated penalties "could deter a person of ordinary firmness from exercising his First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir. 2000)). It is well established that a false disciplinary charge is a sufficient adverse action, even if the plaintiff is eventually cleared of the charge. *Booker*, 855 F.3d at 537, 544; *see also Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994) ("Because the retaliatory filing of a disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, the injury to this right inheres in the retaliatory conduct itself."). Accordingly, Delk has sufficiently alleged that Adams and M. Mullins took adverse actions against him.

Finally, Delk sufficiently pleads a causal connection between defendants' conduct and Delk's writing of grievances against them and other correctional officers. To demonstrate a causal connection, Delk can use circumstantial evidence to show that Adams and M. Mullins were aware of the First Amendment activity and that the retaliation occurred within "some degree of temporal proximity" to that activity. *Constantine*, 411 F.3d at 501. A causal connection can be inferred when defendant's adverse action "was taken in response to the exercise of a constitutionally protected right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Here, Delk alleges that Adams and M. Mullins (1) explicitly told Delk that the false charges were "to force" Delk to stop writing letters and grievances against the correctional officers; and (2) were in close temporal proximity to Delk's protected activity. As such, Delk's allegations are

sufficient to allow a reasonable fact finder to conclude a causal connection. Because Adams and M. Mullins dispute these allegations, genuine disputes of material fact remain as to the retaliation claims, and neither Adams nor M. Mullins have demonstrated they are entitled to summary judgment or qualified immunity.

## X.    RLUIPA and First Amendment Claims against Scarberry and Gregg

Lastly, Delk alleges that Dietician Gregg and Food Service Supervisor Director Scarberry violated his free exercise rights under RLUIPA and the First Amendment by adopting policies that changed the menu of Delk's Common Fare diet, which restricted his religious need for a diet including pure, natural, and organic foods, with no eggs or pork.

### A.  Facts Related to Scarberry and Gregg

Since 2014, Delk has been enrolled in the VDOC's Common Fare diet, which accommodates his religious need to abstain from consuming eggs and pork. Common Fare is a non-meat, pork free diet designed by the VDOC to meet the nutritional requirements of various religious beliefs. Beginning on September 27, 2017, Delk alleges that Defendants Gregg and Scarberry changed the Common Fare by adding eggs to the menu, preventing Delk from receiving meals consistent with his religious beliefs. (Compl. ¶ 153). The change caused "great turmoil" to Delk and resulted in Delk occasionally not eating. (*Id.*). Delk felt forced to eat eggs in contravention of his religious beliefs and beans despite an allergy, because if he refused to eat those foods, he would be considered by prisons officials to be on a "self imposed hunger strike." (*Id.* at ¶ 162). Consequently, the menu change caused Delk to experience starvation, and he has lost approximately fifty pounds. (*Id.* at ¶ 163) (stating that he dropped "consistently" from 184 lbs. to 132 lbs., "and is still dropping"). Delk also asserts that he was "denied participating in the [Ramadan] feast and given spoiled food during this month of fasting." (*Id.* at ¶ 156).

In their motion for summary judgment, Defendants heavily rely on the court's opinion in Delk's previous case, which dealt with similar claims, *Delk v. Younce*, No. 7:14cv00643, 2017 WL 1011512, at *13-14 (W.D. Va. Mar. 14, 2017). In that case, I determined that Delk failed to identify:

> any features of the Common Fare menu that would more completely have accommodated his purported religious need for organic, pure, and natural foods than did the no-egg diet he received from 2013 to 2015. Indeed, in 2015, he complained that the Common Fare menu itself contained eggs, in violation of his dietary requirements. Delk admits, however, that he never ate the eggs he received. He merely threw them away. Within a year, Defendants also accommodated his request to receive substitution foods in place of eggs on the Common Fare menu.

*Id.* at *14. Delk's allegations here are nearly identical, but he now asserts, under oath, that eggs and beans are back on his menu, he has lost significant weight, and he cannot refuse to eat the eggs *and* beans without being extremely unhealthy and/or being put on hunger strike protocol.[19]

Defendants also contend that they were not personally involved with the creation or decision to implement the policy leading to Delk's food issues. Scarberry asserts that the Common Fare menu is a planned menu that cannot be changed at the facility level, "except where seasonal availability of produce items warrants that substitutions be made." (Scarberry Aff. ¶¶ 6, dkt. 92-7). Substitutions for food products are rare, and there is no alternative food item to replace eggs when eggs are on the menu. (*Id.* at ¶¶ 7). Any substitutions or composition of meals is determined pursuant to Food Service Policy and instructions from the VDOC Dietician. (*Id.*). Furthermore, Scarberry submits that, as Kitchen Director, he conducts many spot checks on trays each day but does not inspect every food tray served to inmates. (*Id.* at ¶¶

---

[19] I note that Delk does not receive pork and he does not claim that the consumption of beans is against his religion—just that he is allergic to them. It is unclear whether Delk received an official medical diagnosis for a bean allergy.

6-8).  Instead, food service personnel provide quality control checks on the trays at each meal. (*Id.*).

## B.  Standards

The First Amendment's protection of the right to exercise religious beliefs extends to all citizens, including inmates.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  To state a claim under the Free Exercise clause, "an inmate, as a threshold matter, must demonstrate that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion." *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018) (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).   A "substantial burden" on a person's religious exercise is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate h[is] beliefs[.]" *Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012) (quoting *Lovelace v. Lee*, 472 F.3d, 174, 187 (4th Cir. 2006)).  The inmate must demonstrate that the substantial burden was a product of a defendant's conscious or intentional interference with religious rights.   *Wall v. Wade*, 741 F.3d 492, 500 n. 11.   However, when determining whether a defendant or prison's practice substantially burdens the inmate's religious exercise, "courts must not judge the significance of the particular belief or practice in question." *Lovelace*, 472 F.3d at 187 n.2.

When an inmate establishes that a prison policy or practice substantially burdens his religious exercise, however, there is no First Amendment violation "if the government can demonstrate that it 'is reasonably related to legitimate penological interests.'" *Carter*, 879 F.3d at 140 (quoting *Turner v. Safley*, 482 U.S. 78, 89-92 (1987)).  Whether a regulation is reasonably related depends on:

> "(1) [W]hether there is a valid, rational connection between the prison regulation or action and the interest asserted by the government, or

whether this interest is so remote as to render the policy arbitrary or irrational; (2) whether alternative means of exercising the right . . . remain open to prison inmates, an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any obvious, easy alternatives to the challenged regulation or action, which may suggest that it is 'not reasonable, but is [instead] an exaggerated response to prison concerns.'"

*Lovelace,* 472 F.3d at 200.

On the other hand, RLUIPA provides more stringent protection of prisoners' free exercise rights than does the First Amendment and applies a test of "strict scrutiny instead of reasonableness." *Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015) (quoting *Lovelace*, 472 F.3d at 186). RLUIPA prohibits government officials from imposing a substantial burden on the religious exercise of an inmate unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1(a).

## C. Analysis

Defendants admit that the VDOC was unable or unwilling to continue with the no-egg Common Fare diet that was "approved" in 2016 because of the no-substitution rule. However, even if Delk now meets the threshold evidentiary burden to prove that the Defendants' deprivations (*i.e.*, a menu heavy with eggs and beans) resulted in a substantial burden on his religious views, Delk has failed to sufficiently attribute these deprivations to Scarberry or Gregg. He only states conclusory allegations that they created and implemented the challenged VDOC policy that prevented no substitutions to meal trays. *See Wright*, 766 F.2d at 850 (a plaintiff must "affirmatively show[] that the official charged acted personally in the deprivation of the plaintiff's rights."). Defendants establish that they have virtually no ability to change Delk's

meals at the facility level and no replacement for egg items. Therefore, Scarberry and Gregg (1) are not personally responsible for the change in policy that Delk alleges violates his rights under the First Amendment and RLUIPA; and (2) they ultimately cannot provide Delk the relief he requests.

As to Delk's allegations regarding spoiled food and the Ramadan meal, deprivations of food are generally Eighth Amendment claims, which Delk did not raise against Scarberry and Gregg. Even if I construe his allegations as an Eighth Amendment claim, "occasional short-lived problems with food service and isolated instances of spoiled food . . . do not state cognizable claims under the Eighth Amendment. *Reed v. Olson*, No. 4:09cv3126, 2011 WL 765559, at *3 (D.S.C. Jan. 19, 2011) (citing *Bedell v. Angelone*, No. 2:01cv780, 2003 WL 24054709, at *14 (E.D. Va. 2003)); *Lackey v. Midget*, No. 3:12cv820, 2014 WL 2890139, at *3 (E.D. Va. June 25, 2014) (collecting cases where courts granted summary judgment on First Amendment claims when inmates missed some Ramadan meals).

Therefore, viewing the factual allegations in the light most favorable to Delk, Delk fails to establish a genuine dispute of material fact regarding his allegations against Scarberry and Gregg, and Defendants are entitled to qualified immunity for damages and summary judgment on these claims.

## XI.    Official Capacity

To the extent Delk brings this action against defendants in their official capacities for monetary damages, such claims are not cognizable under § 1983. "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989). Because the prison official defendants in their official

capacities are not "persons" who can be sued under § 1983, I must dismiss Delk's claims against them.

## XII.

For the reasons stated, Defendants' motion for summary judgment is granted in part and denied in part.

It is so ordered.

The Clerk is directed to send a copy of this memorandum opinion to the parties.

**ENTER** this <u>26th</u> day of March, 2019.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE